IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRI BASHAW, ) | |
| ) | |
| Plaintiff, ) | Case No. 05 C 4014 |
| v. ) | |
| ) | Judge Virginia M. Kendall |
| AMERICAN FAMILY MUTUAL ) | |
| INSURANCE COMPANY, ) | |
| Defendant. ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Terri Bashaw ("Plaintiff") brings suit against American Family Mutual Insurance Company ("AFMIC") for failure to settle in good faith a personal injury suit in which Plaintiff, an insured of AFMIC, was a defendant. Plaintiff brings a second claim for attorney's fees against AFMIC pursuant to 215 ILCS 5/155. AFMIC moves for summary judgment on both counts. Because there exists a genuine issue of material fact as to whether AFMIC breached its duty of good faith, summary judgment on the failure to settle in good faith claim is denied. Because § 155 does not apply to the tort of failure to settle in good faith, summary judgment on the § 155 claim is granted.

Facts

On August 8, 1989, AFMIC issued Plaintiff an automobile liability insurance policy with limits of $100,000 per person and $300,000 per occurrence. Plaintiff's Statement of Additional Undisputed Facts ("Pltf. 56.1 Facts") at ¶ 5. On February 12, 1997, Plaintiff and Charles Wilson ("Wilson") were in an automobile accident in which both parties were injured. *Id.* at ¶ 6. On May 8, 1997, Wilson filed a suit against Terri Bashaw in the Cook County Circuit Court, which action

was later transferred to Lake County and then voluntarily dismissed. *Id.* at ¶¶ 7-11. On June 22, 1999, the case was refiled in Cook County by new attorneys, and again transferred to Lake County (the "*Wilson* case"). *Id.* AFMIC acknowledged the policy and retained counsel to defend Plaintiff in the *Wilson* case. *Id.* at ¶ 6. William P. McElligott assumed defense of Plaintiff. *Id.* at ¶ 19. Shortly after the case was filed, AFMIC increased its reserve on the case from $15,000 to $50,000. Defendant's Statement of Undisputed Facts ("Def. 56.1 Facts") at ¶ 13.

Discovery on the case took years. As the case approached trial in 2002, McElligott assessed Wilson's medical damages at approximately $16,000. Pltf. 56.1 Facts at ¶ 24; Pltf. Ex. 3. AFMIC used an insurance adjustment tool, Collosus, to evaluate the case. Collosus estimated the gross settlement range of the case between $30,509 and $35,249. *Id.* at ¶ 18. In correspondence with an adjuster at AFMIC, Eileen Lenhardt ("Lenhardt"), McElligott relayed his assessments of the case against Plaintiff as discovery unfolded, including his assessments that a jury would find Plaintiff 100% liable and that the case should settle between $30,000 and $40,000. *Id.* at 20; *see also* Pltf.'s Ex. 3. Both claims adjusters at AFMIC, Lenhardt and Maria Jensen ("Jensen") testified that they believed the verdict range for Wilson against Plaintiff was between $30,000 and $50,000. Def. 56.1 at ¶ 10, 21. Plaintiff's expert, Daniel Varner, testified that on the basis of his review of the records and his familiarity with the industry, the investigation by AFMIC and the $50,000 reserve were reasonable. Def. 56.1 at ¶ 60.

Lenhardt initially gave McElligott authority to offer $15,500 to counsel for Wilson, which McElligott conveyed to counsel for Wilson. McElligott told Lenhardt that counsel for Wilson would settle the case for the policy limit of $100,000 and that he believed the value of the case was within the policy limit. Def. 56.1 Facts at ¶ 16. Lenhardt had the impression that counsel for Wilson

might take less than the policy limit of $100,000. Pltf. 56.1 Facts at ¶ 34. Lenhardt repeatedly asked McElligott to seek a counter-offer in response to the $15,500, but did not receive any firm written demand from them. Def. 56.1 at ¶ 12; Def. Ex. 4 at 9. Lenhardt did not authorize McElligott to increase the settlement offer because she did not wish to "bargain against herself." Def. 56.1 at Ex. 4, Pg. 10.

Shortly before trial, Judge Brady of the Lake County Court conducted a mediation and recommended that the case settle between $50,000 and $70,000. Def. 56.1 Facts at ¶ 25. The judge also stated that the verdict potential could be in the area of $70,000 to $90,000. *Id.* On the first day of the trial, Jensen (who was acting in Lenhardt's stead while Lenhardt was on vacation) authorized McElligott to move above the initial offer of $15,500 if he could convince counsel for Wilson to "meet us halfway, 50 or so." Def. 56.1 Facts at ¶ 22. She did not authorize McElligott to offer a specific figure, but did tell McElligott to call her if counsel for Wilson reduced their offer to $40,000. Jensen Dep., Def. Ex. 6, at 51.

Brian Bashaw, Plaintiff's husband, retained counsel Davis Carr to advise the family with respect to the case against Plaintiff.[1] Def. 56.1 Facts at ¶ 46. Mr. Bashaw did not dispute that he received a letter from AFMIC shortly after the suit had been filed stating that the Bashaws could be personally liable for a judgment in excess of $100,000, and that they might wish to consult with an attorney. *Id.* at ¶ 49. Mr. Bashaw testified that Mr. Carr tried to communicate with McElligott and AFMIC about settlement but had little success. *Id.* at ¶ 53. Mr. Bashaw acknowledged that he and his wife had conversations with Carr about what would happen if the verdict exceeded the policy limits. B. Bashaw Dep., Def. Ex. 9, at 200-201. The Bashaws had concerns about the case going

---

[1] Mr. Davis Carr is deceased and was not deposed.

3

to trial, and had particular concerns after the trial started and Wilson testified to the extent of his injuries. B. Bashaw Dep. Def. Ex. 9 at 149-151. The Bashaws talked with Jensen about their desire to settle the case, and Mr. Carr sent a letter requesting settlement, but their requests were not heeded by AFMIC. Def. 56.1 at ¶ 55; B. Bashaw Dep., Def. Ex. 9 at 148-51.

On June 27, 2002, a jury returned a verdict in favor of Wilson. Def. 56.1 Facts at ¶ 7. Reduced by his own contributory negligence of 10%, the jury awarded Wilson $585,390 in damages. *Id.*

Discussion

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878,

4

887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").[2]

### A. Failure to Settle in Good Faith

Plaintiff alleges that AFMIC breached its duty of good faith to Plaintiff, the insured, when it refused to settle the claim by Wilson against Plaintiff. If an insurer's refusal to settle a claim amounts to bad faith, the insurer may be held liable for the entire judgment against the insured, including the amount of the judgment in excess of the policy limits. *Mid-America Bank & Trust Co. v. Commercial Union Ins. Co.*, 587 N.E.2d 81, 84 (Ill. App. Ct. 1992). "Where an insurer is pursued for its refusal to settle a claim, 'bad faith' lies in an insurer's failure to give at least equal consideration to the insured's interests when the insurer arrives at a decision on whether to settle the claim." *O'Neill v. Gallant Ins. Co.*, 769 N.E.2d 100, 106 (Ill. App. Ct. 2002); *Bailey v. Prudence Mutual Cas. Co.*, 429 F.2d 1388, 1391 (7th Cir. 1970). An insurer is not required to hold an insured's interest paramount to its own. *See Adduci v. Vigilant Ins. Co., Inc.*, 424 N.E.2d 645, 650

---

[2] Defendant argued in its Reply that Defendant's 56.1 Statement of Material Facts should be deemed admitted because Plaintiff failed to file a response. *See* L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.") While Plaintiff did not file a document titled "Response to Defendant's 56.1 Facts," Plaintiff did file a 56.1 Statement of Material Facts that controverts the statements of Defendant. Plaintiff's Rule 56.1 Statement of Material Facts contains short and concise statements with adequate citations to the record. In those cases where Plaintiff agreed with Defendant's characterization of the facts, Plaintiff typed Defendant's statements verbatim.

While Plaintiff's counsel should take care to follow the letter of Local Rule 56.1 in the future, the Court will not take Defendant's statement of material facts as admitted where the record reflects that Plaintiff has controverted statements and provided adequate citation to the record.

(Ill. App. Ct. 1981) (declining to adopt rule that insured's interests are paramount to insurer's in settling claims).

Courts consider a number of factors in deciding whether to find an insurer's actions constitute bad faith. These factors include: (i) potential for an adverse verdict; (ii) potential for damages in excess of policy limits; (iii) refusal to negotiate; (iv) communication with the insured; (v) adequate investigation and defense; and (vi) advice of the insurance company's own adjusters and defense counsel. *See generally O'Neill,* 769 N.E.2d 100 (reviewing seven factors to be considered when reviewing a bad faith claim against an insurer); *Phelan v. State Farm Mutual Auto. Ins. Co.*, 448 N.E.2d 579, 584-85 (Ill. App. Ct. 1983) (relying on factors of potential for adverse verdict and potential for damages in excess of amount); *Kavanaugh v. Interstate Fire and Cas. Co.*, 342 N.E.2d 116 (Ill. App. Ct. 1976) (relying on factors of clarity of liability, offer of settlement and probable amount of damages); *Mid-America*, 587 N.E.2d at 84 (relying on lack of communication with plaintiff and an unanswered settlement offer three years old); *Bailey*, 429 F.2d 1388 (7th Cir. 1970) (relying on refusal to negotiate, communication with client, and probable amount of damages).

*Possibility of an Adverse Verdict*

In considering whether evidence of bad faith exists, courts examine the potential for an adverse verdict. *See Phelan,* 448 N.E.2d at 585 (describing as "prerequisites to a finding of liability" that "the probability of an adverse finding on liability is great and the amount of damages would exceed the policy limits"); *Kavanaugh,* 342 N.E.2d at 121 (holding that while insurers generally have no duty to settle within policy limits, "there is a well recognized exception to the general principle when the probability of an adverse finding on liability is great and the amount of probable damages would greatly exceed coverage").

6

There exists at least a genuine issue of material fact as to whether AFMIC was informed and understood that there existed a high probability of an adverse ruling for Plaintiff in the *Wilson* case. McElligott informed Lenhardt in multiple letters, including a letter sent the week before the trial, that his investigation of the case suggested that Plaintiff was 100% liable. In spite of that knowledge, Lenhardt continued to offer an amount in settlement which he knew did not even fully cover the injured's medical bills – approximately $16,000. McElligott also informed Lenhardt that the judge in the *Wilson* case believed that any negligence against Wilson would not exceed 10%. *See* 6/18/02, 6/21/02 ltrs., Pltf. Ex. 3. Lenhardt, however, specifically informed McElligott that he was not to admit liability at trial, only after which did McElligott agree to try the case on both liability and damages. 6/21/02 Ltr., Pltf. Ex. 3; 6/21/02 Ltr., Pltf. Ex. 4.

*Probability of Excess Damages*

In finding bad faith, courts rely consistently upon the evidence of the potential for damages in excess of the policy limit. *See, e.g., Haddick v. Valor Ins.*, 763 N.E.2d 299, 304 (Ill. 2001) ("The duty of an insurance provider to settle arises when a claim has been made against the insured and there is a reasonable probability of recovery in excess of the policy limits. . ."); *O'Neill,* 769 N.E.2d at 108 (denying motion to reconsider a jury award in an excess liability claim where insurance company's own adjusters had recommended settlement at the policy limits and estimated the damages at 15 to 30 times the policy limits); *Phelan*, 448 N.E.2d at 585 (upholding jury verdict of bad faith where defendant was aware that damages would exceed the limit on the basis of the extent of victim's injuries); *Bailey,* 429 F.2d at 1390 (upholding bad faith determination where insurer had repeated internal suggestions to settle for the policy limits in light of the extensive injury);

*Kavanaugh*, 342 N.E.2d at 121 (examining whether "the amount of damages would greatly exceed coverage").

In this case, while the evidence suggests that the parties anticipated an adverse verdict in the *Wilson* case, the insurer defending the case did not receive information that the personal injury case stated that damages against Plaintiff would exceed the policy limits of $100,000. Lenhardt and Jensen assessed the potential damages in the case just prior to trial between $25,000 and $30,000 and that a worst case verdict would be $50,000. Lenhardt & Jensen Affs., Def. Exs. 3 & 5. McElligott's written correspondence with Lenhardt indicates that he assessed the damages from Wilson's medical injuries as a result of the accident around $15,000 and assessed the settlement value of the case at $40,000 just prior to trial. Pltf. Ex. 3. He asserted his belief that a jury could find for Wilson and award $65,000 to $75,000. *Id.* AFMIC was aware that the judge who tried the personal injury recommended shortly before trial that the case settle for between $50,000 and $70,000, and stated that the verdict potential could be $70,000 to $90,000. Pltf. 56.1 Facts at ¶ 25; Lenhardt Dep., Def. Ex. 4, at 57. Although the record contains multiple references that the case should settle in excess of the amount AFMIC had offered in settlement and that the judge's assessment approached the policy limits, the only information that the insurer had that the damages could exceed the policy limits came solely from Wilson's demands.

On the other hand, the record taken as a whole reflects consistent increases in each person's valuation of the damages in the case. Although entered into the record only through Plaintiff's expert, Mr. Varner, a mediation proceeding early in the case placed the settlement figure at $15,000. Def. 56.1 Facts at ¶ 64. Sometime thereafter, indicative of the insurer's belief that their exposure was increasing, AFMIC raised the reserve value on the case to $50,000. During investigation,

McElligott moved upward in his valuation of the settlement of the case as discovery continued and he gained more information. By the eve of the trial, the judge in the case viewed the settlement figure between $50,000 and $70,000 and found that a jury could award $70,000 to $90,000 – the high end of which was close to the policy limit. By the opening statements and testimony of Wilson, the Bashaws wanted to settle on the basis of the strength of Wilson's testimony and sought to have the case settled within the policy limits. Instead of re-evaluating the case at each step and recognizing the increased risk, AFMIC continued to hold tight to its $15,500 settlement offer and never approached Wilson during the trial to offer more. Viewing the facts in the light most favorable to the plaintiff, the record reflects a reasonable probability by the eve of trial that the damages in the case could exceed the policy limits.

*Refusal to Negotiate*

The insured's willingness or refusal to negotiate a settlement within the policy limits is a factor to be considered. *See, e.g.*, *O'Neill*, 769 N.E.2d at 107 (finding bad faith where insurer refused to answer a request to settle a claim for policy limits); *Mid-America*, 587 N.E.2d at 84 (finding bad faith where insurer refused to settle for policy limits when offer went outstanding for three years); *Kavanaugh*, 342 N.E.2d at 121 (no bad faith where insurer offered the policy limits after denial of directed verdict and plaintiff refused). "Nonetheless, an insurer's refusal to settle within policy limits does not render it liable per se to the insured." *Kavanaugh*, 342 N.E.2d at 121.

The evidence is undisputed that AFMIC offered $15,500 to settle the claim against Plaintiff. The parties dispute the extent of the firmness of an offer from counsel for Wilson, but taken in the light most favorable to Plaintiff, the adjusters at AFMIC understood that Wilson's attorneys made an oral demand to AFMIC via McElligott for slightly less than the $100,000 policy limit. Pltf. 56.1

9

at ¶¶ 34-35, Pltf. Ex. 1. The fact that a plaintiff offers to settle within the policy limits is the initiation of the duty to settle. *See Haddick*, 763 N.E.2d at 305 (stating that the duty to settle arises when the third party demands settlement within the limits); *see also Cernocky v. Indemnity Ins. Co. of North America*, 216 N.E.2d 198, 209 (Ill. App. Ct. 1966) (reversing directed verdict in favor of defendant insurer and remanding for trial).

The record reflects that McElligott recommended to Lenhardt on multiple occasions that the case be settled in the range of $40,000, and the record reflects that AFMIC had placed $50,000 in reserve for the claim. *See* Lenhardt Dep., Def. Ex. 4, at 31-32. The record also reflects that the judge in the *Wilson* case suggested that the case should settle for between $50,000 and $70,000 shortly before trial and that a verdict could be close to the policy limits ($90,000). Finally, the record contains evidence that Plaintiff and her husband requested during trial of the *Wilson* case that AFMIC make efforts to settle the claim, but these requests were not heeded by AFMIC. B. Bashaw Dep., Def. Ex.9 at 149-52. Jensen, the AFMIC representative at the trial, testified that she told McElligott that "we were willing to move off the 15" if he could get a figure from Wilson's attorney, but also admitted that she did not give McElligott a figure other than the $15,500 to take to the plaintiff's attorney. *See* Jensen Dep., Def. Ex. 6 at 46-47.

AFMIC argues that it made the $15,500 offer and received no specific written counteroffer from Wilson's attorneys; AFMIC did not re-offer because it did not wish to "negotiate against itself" by raising the offer without movement by Wilson's attorneys. That theory, however, does not protect AFMIC against an argument that it unreasonably refused to negotiate. AFMIC did not ever move from that figure, even when: (i) every estimate they received from their defense counsel, and their computer program, placed the settlement amount at a higher figure; (ii) they had set aside a

10

reserve amount of $50,000 for the case; and (iii) during discovery and approaching trial, it became clear that Wilson's medical bills alone would likely exceed the $15,500 figure; and (iv) all indicators pointed to the risk of loss increasing over time as information changed, others weighed in, and the credibility of the witnesses was evaluated. On the basis of these facts, viewed against a verdict nearly six times the policy limit, a reasonable jury could find that AFMIC's behavior in refusing to negotiate was unreasonable and that AFMIC was not giving "at least equal consideration to the insured's interests" when it decided not to offer anything more than its original $15,500 offer. *See O'Neill v. Gallant Ins. Co.*, 769 N.E.2d 100, 106 (Ill. App. Ct. 2002).

*Communication with the Insured*

Courts review the insurance company's communication with the defendant client in determining whether an insurer has breached its duty of good faith. *See, e.g., Bailey*, 429 F.2d at 1390. There is a genuine issue of material fact as to the extent of AFMIC's communication with the Bashaws. AFMIC points to three forms of communication with the Bashaws: a letter sent by AFMIC to the Bashaws shortly after litigation had been filed, conversations between Brian Bashaw and someone at AFMIC in 1997, and a letter sent in 2002 advising the Bashaws of the progress of the case. But the scope and purpose of the initial letter has been cast into doubt by the testimony of Lenhardt, who admitted that the letter covered the loss of use portion of the policy rather than the personal liability portion. *Compare* B. Bashaw Dep., Def. Ex. 9 at 67-70; Lenhardt Dep., Pltf. Ex. 4 at 74-75. Lenhardt herself could not remember whether she had communicated with the Bashaws about getting independent counsel, and testified that she told McElligott to communicate with the Bashaws. Lenhardt Dep., Def. Ex. 4 at 78-79. Brian Bashaw did not remember the conversations with the representatives of AFMIC. B. Bashaw Dep., Def. Ex. 9, at 72-73; 81-82. And while Brian

11

Bashaws acknowledged receipt of a letter sent during the course of preparation for the *Wilson* case advising the Bashaws of the difference in damage estimates between Wilson and AFMIC, the letter also included McElligott's assurances that the case was worth $30,000 to $40,000. B. Bashaw Dep., Def. Ex. 9 at 127-8.

The parties dispute the extent to which Mr. Carr, the Bashaws and McElligott communicated about the course of the *Wilson* case or the Bashaws' desire to settle. *Id.* at 133-35; Lenhardt Dep., Def. Ex. 4 at 78-79. The facts reveal that the evaluation of the case evolved over the course of the five years from the time it was initiated until it was brought to trial. Taking the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that AFMIC and its representatives failed their obligation to communicate with Plaintiff regarding the evolution of the case, the increased potential for higher damages, and their refusal to offer any settlement amount over their original offer (made years before trial).

*Adequate Investigation and Defense*

The degree of investigation and defense of the claim against the insured is a factor to be considered in determining bad faith. *See O'Neill*, 769 N.E.2d at 107. There is no allegation in this case that AFMIC and McElligott failed to adequately investigate and defend that Bashaws. The record reflects that McElligott conducted discovery into the cause of the accident, deposed witnesses and experts, and communicated with AFMIC regarding the course of the claims.

*Suggestions of the Defense Counsel and Insurer's Claims Adjusters*

The suggestions of the insurer's own personnel and retained defense counsel are factors to be considered. *O'Neill*, 769 N.E.2d at 106-07; *Phelan*, 448 N.E.2d at 585. It is undisputed that AFMIC's own settlement calculation program, Colossus, placed the settlement figure for the *Wilson*

case between $30,000 and $35,000, and that the insurance adjusters placed the reserve amount on the case at $50,000. It is also undisputed that AFMIC never offered more than $15,500 for settlement in spite of this internal assessment. *See* Lenhardt Dep., Def. Ex. 4, at 39. It is also undisputed that McElligott repeatedly gave the adjusters for AFMIC his professional opinion that case should settle for between $30,000 and $40,000. Pltf. Ex. 3. AFMIC itself moved the reserve amount on the *Wilson* case from $15,000 to $50,000 shortly after the suit was filed. Although McElligott repeatedly told the adjusters that he did not think that the case would exceed the policy limits; he also believed that a jury would find that Terri Bashaw was 100% liable for the accident. Pltf. Ex. 3. Viewing the record in the light most favorable to the plaintiff, a reasonable jury could conclude that AFMIC unreasonably disregarded the advice of its own defense counsel and did not give equal consideration to the risk of increased exposer to their insured.

In conclusion, the facts presented by the parties indicate that there exists a genuine issue of material fact that AFMIC acted in bad faith in refusing to settle, or attempting to settle, the claim against Plaintiff. AFMIC argues that the paucity of evidence as to the potential for excess damages, taken alone, should be sufficient to support summary judgment in its favor. The ultimate standard as to whether AFMIC breach its duty to settle in good faith is whether AFMIC considered in good faith its interests *equally* with consideration of Plaintiff's interests. *See Bailey*, 429 F.2d at 1391. The probability of excess damages is a factor to be considered, but a reasonable jury could weigh testimony of the parties and the other disputed evidence - the probability of an adverse verdict, the lack of negotiation toward settlement, the degree of communication with Plaintiff, and the advise of defense counsel - and conclude that these other factors show that AFMIC committed a breach of

its good faith duty to settle, and outweigh the admittedly favorable evidence that the excessive damages verdict had not been anticipated.

### B. Claim under 215 ILCS 5/155

Plaintiff brings a second claim with identical facts pursuant to 215 ILCS 5/155. The statue permits attorneys fees in favor of a successful plaintiff who shows that the conduct of an insurance company with respect to a claim is "unreasonable or vexatious." Section 155 states in relevant part:

> (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:
> (a) 60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
> (b) $60,000;
> (c) the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

215 ILCS 5/155. The parties dispute whether § 155 applies to excess liability claims against an insurer for its failure to settle with a third party. AFMIC relies upon the Illinois Supreme Court case *Cramer v. Insurance Exchange Agency*, 675 N.E.2d 897 (Ill. 1996) and the Northern District case *National Union Fire Insurance Co. v. Continental Illinois Corp.*, 673 F. Supp. 267 (N.D. Ill. 1987) (distinguishing between "duty to settle" cases and § 155) in support of its position that claims involving third parties are not covered by § 155. Plaintiff relies upon the Seventh Circuit's subsequent case, *Prisco Serena Sturm Architects, Ltd. v. Liberty Mutual Insurance Co.*, 126 F.3d 886 (7th Cir. 1997) as support that current law interpreting *Cramer* extends § 155 to cover failure to settle claims.

14

*Cramer* is the most recent case to discuss the scope of § 155 in detail. The *Cramer* court, in extensive dicta, explained that the "duty to settle" cases arise as a result of the need for a remedy in tort for an injury that is outside the limits of the contract between the insurer and the insured. *See Cramer*, 675 N.E.2d at 903. The tort for breach of the "duty to settle" arises not from the terms of contract between the insurer and the insured, but rather from the fact that the insured policyholder relinquished defense of the underlying suit to the insurer and relied upon the insurer to his detriment to conduct a proper defense of the claims. *Id.* The *Cramer* court distinguished "duty to settle" claims from contractual claims, and explained that the statutory remedy of attorney's fees via § 155 is a legislative effort to add a punitive component to a claim for breach of contract. *Id.* The *Cramer* court affirmatively cited the Northern District's most comprehensive discussion of the relationship between § 155 and the duty to settle, *National Union*, which also held that § 155 does not apply to duty to settle claims. *See National Union*, 673 F. Supp. 267 ("Unreasonable refusals to settle a claim against the insured must be viewed as a type of conduct not covered by Section 155.").

*Prisco* is inapplicable to this case. The Seventh Circuit in *Prisco* examined § 155 in the context of a third-party's claim that it was covered under an insurance policy and had a right to sue for the insurer's failure to cover and defend the third party. *See Prisco*, 126 F.3d at 888 (summarizing facts of underlying dispute). Plaintiff relies upon a single line in *Prisco*, "Illinois courts have rejected the claim that § 155 does not apply to third-party insurance and claims for defense" as proof that § 155 applies to the case before this Court. This reliance is misplaced, for the context of the *Prisco* discussion of § 155 regards the duty to defend a third-party that claimed it was entitled to coverage - not, as is the case here, a breach of the duty to settle. *See id.* at 894. The *Prisco* court did not mention, much less discuss, the Illinois Supreme Court's *Cramer* decision in

the *Prisco* decision, nor did the *Prisco* court discuss or disturb the leading Northern District case on the matter, *National Union*. Therefore, the Court holds consistent with *Cramer* and *National Union* that § 155 does not apply to common law claims for breach of the duty to settle.

## Conclusion

Wherefore, the Court denies summary judgment for AFMIC on the claim for failure to settle in good faith, and grants summary judgment for AFMIC on the claim for attorney's fees pursuant to 215 ILCS 5/155.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: December 8, 2006